Original Decision Mailed:                                      Redesignation:
January 19, 2022                                       March 29, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Jasmin Larian, LLC*

————

Serial No. 87522459

————

Olivera Medenica of Dunnington Bartholow & Miller LLP,
    for Jasmin Larian, LLC.

Matthew Ruskin, Trademark Examining Attorney, Law Office 106,
    Mary I. Sparrow, Managing Attorney.

————

By the Board:

The Board has chosen to redesignate the decision that issued on January 19, 2022 as a precedent. A copy of the decision, bearing such designation, is attached.

The decision that issued on January 19, 2022 is also corrected as follows: page 4, footnote 9, line 2, "was" has been changed to "has"; page 18, footnote 37, second paragraph, lines 2 and 3, "refusals" has been changed to "refusal", and "claims" has been changed to "claim"; page 20, second bullet point, first line, "was" has been deleted; pages 20 and 38 minor spacing inconsistencies have been corrected; page 22, last line, the left-facing single quotation mark before the word "generally" has been deleted and replaced with a right-facing single quotation mark; page 24, last paragraph, line 4, the word "considering" has been added between the words "on" and "comments"; page 30, line 4, the double quotation marks around the words "Ark Bag" have been deleted and replaced with single quotation marks; and page 46, line 9, the word "produce" has been changed to "product".

# # # #

THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: December 2, 2021                    Mailed:   January 19, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Jasmin Larian, LLC*

————

Serial No. 87522459

————

Olivera Medenica of Dunnington Bartholow & Miller LLP,
    for Jasmin Larian, LLC.

Matthew Ruskin, Trademark Examining Attorney, Law Office 106[1]
    Mary I. Sparrow, Managing Attorney.

————

Before Cataldo, Lynch, and Allard,
    Administrative Trademark Judges.

Opinion by Allard, Administrative Trademark Judge:

Jasmin Larian, LLC ("Applicant") seeks registration on the Principal Register of

the mark shown below:

---

[1] The application was reassigned to the listed Examining Attorney following Applicant's filing of its Request for Reconsideration on February 3, 2020. Mar. 12, 2020 Office Action at TSDR 1.

Citations in this opinion to the briefs, the record, and other filings in the case refer to TTABVUE, the Board's online docket system. Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any number following TTABVUE refers to the page and paragraph references, if applicable. In contrast, citations to the examination record refer to the USPTO's online Trademark Status and Document Retrieval system (TSDR).



for "handbags", in International Class 18 (the "Ark" bag).[2] The description of the mark

reads as follows:

> The mark consists of the configuration of a three-dimensional handbag. The handbag features the distinct combination of: (1) a structured and flat front and back panels made of thin, uniformly-sized strips of rigid material; (2) arranged in an interlocking manner to form three concentric half circles creating a distinctive see-through sunburst design; (3) topped by horizontal strips and a handle made of the same material with a curved tapering cutaway; (4) a curved side panel made of interlocking pieces of the same material and in the same width as the pieces that make up the front and back panels; and (5) spacers in the form of circular beads that connect the handle pieces. All of the elements submitted as part of the drawing are claimed as part of the mark. The stippling is a feature of the mark and does not indicate color.

Color is not claimed as a feature of the mark.

More than three years after the application was filed, after extensive communications between the Examining Attorney and Applicant, and after voluminous amounts of evidence were made of record by both,[3] the Examining Attorney issued a final refusal, refusing registration on the ground that the proposed

---

[2] Application Serial No. 87522459 was filed on July 10, 2017 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based upon Applicant's claim of first use anywhere and use in commerce since at least as early as January 27, 2013.

[3] We acknowledge the unusual and extensive prosecution history of this application, which includes six Office actions, and we also acknowledge Applicant's understandable frustration caused by them. However, while the USPTO strives for efficiency in the examination of applications, it is more important that the examination be correct than swift.

mark was a generic configuration and, alternatively, that the proposed mark was a nondistinctive product design that had not acquired distinctiveness, both pursuant to Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§1051-52, 1127.[4] Applicant filed a request for reconsideration and made of record additional evidence.[5] The Examining Attorney denied the request for reconsideration[6] and the appeal was resumed.[7] The appeal has been fully briefed, and Applicant and the Examining Attorney appeared for oral argument.

We review the record to determine if the USPTO has met its burden of demonstrating that Applicant's three-dimensional handbag design mark is a generic configuration under Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§1051-52, 1127, or, alternatively, whether the proposed mark is a nondistinctive product design that has acquired distinctiveness under Trademark Act §§ 1, 2, and 45, 15 U.S.C. §§ 1051-52, 1127. As discussed more fully below, we find the mark generic and therefore affirm the refusal to register on the ground of genericness. Even assuming that the mark is not generic but is instead a nondistinctive product design, we find that Applicant has failed to make the necessary showing that the proposed mark has acquired distinctiveness.

---

[4] Oct. 16, 2020 Office Action.

[5] Apr. 16, 2021 Request for Reconsideration ("Req. Recon.").

[6] Apr. 30, 2021 Denial of Req. for Recon.

[7] 12 TTABVUE.

## I. Discussion

By way of background, Applicant was founded in 2011 by Jasmin Larian[8] and has been selling its Ark handbags since January 27, 2013.[9] Although sales were slow for the first two or three years,[10] sales increased sharply in 2017, and Applicant's Ark bag became popular, referred to in the media as, for example, the "It" bag.[11] Applicant's Ark bag is sold by high-end retailers, such as Net-a-Porter and NYC's Fivestory,[12] and celebrities, such as Jessica Alba and Beyoncé, have been photographed with it.[13] Due in large part to the commercial success of the Ark bag, Applicant has expanded its product line to include shoes[14] and swimsuits,[15] for example.

---

[8] Jul. 1, 2019 Response to Office Action, Supplemental Larian Declaration ("Supp. Larian Decl.") ¶¶1, 4 at TSDR 393-94.

[9] *Id.* ¶6 at TSDR 394. We note, however, that Ms. Larian's testimony and related evidence (attached as Exhibit 1) only establish that the mark has been advertised on this date and does not establish that goods were sold or transported in commerce on that date.

[10] Oct. 16, 2020 Office Action at TSDR 77 (per the Allure.com magazine interview with Ms. Larian: "'No one actually bought [the bag] for two years,' says Jasmin Larian, the brainchild behind Cult Gaia."); *Id.* at TSDR 74 (Glamour.com magazine reported: "Larian introduced the first-ever Ark bag in 2013, but back then, 'it just didn't take off! So I was kind of like, 'OK, next,'" she says."). Applicant's sales data confirms this, as sales increased sharply in 2017. Jul. 1, 2019 Response to Office Action, Supp. Larian Decl., Exhibit 5 at TSDR 1165 (Total Gross Sales spiked from over $308,000 in 2016 to over $5 million in 2017).

[11] Oct. 16, 2020 Office Action at TSDR 76.

[12] Apr. 16, 2021 Req. Recon., Exhibit 1 to the Declaration of Olivera Medenica In Support of Applicant's Request for Reconsideration in Response to Office Action Dated Oct. 16, 2020 ("Medenica Decl.") at TSDR 129.

[13] *Id.* at TSDR 221-23 (Exhibit 5 to the Medenica Decl.).

[14] Jul. 1, 2019 Response to Office Action at TSDR 363-85.

[15] *Id.* at TSDR 348-59, 375-83.

While the Ark bag may be commercially successful, the issue before us whether the bag embodying the proposed mark is generic, i.e., a common handbag design, or, alternatively, if it is a nondistinctive product design that has acquired distinctiveness. The two issues are interrelated to the extent that third-party use of the same or a similar design impacts each determination. With that in mind, we turn first to the issue of whether the proposed mark is generic and review the evidentiary record in detail.

## A. Genericness Refusal

It is well established that a generic product design cannot be registered. Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051, 1052, 1127; *In re Odd Sox LLC*, 2019 USPQ2d 370879, at \*16 (TTAB 2019); *Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1555 (TTAB 2009) (generic product design unregistrable).

Further, courts exercise particular caution when extending protection to product designs because such claims present an acute risk of stifling competition. This is because "[w]hile most trademarks only create a monopoly in a word, a phrase, or a symbol, 'granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 59 USPQ2d 1813, 1820-21 (2d Cir. 2001)(quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 42 USPQ2d 1641, 1646 (2d Cir. 1997)).

In the context of product design, genericness may be found where the design is so common in the industry that it cannot be said to identify a particular source. *Stuart*

*Spector,* 94 USPQ2d at 1555 (noting that a design may be deemed incapable of registration where it is "so common in the industry that it cannot be said to identify a particular source"). For these product designs, registration on the Principal Register must be refused on the ground that the proposed mark fails to function as a mark.

The two-step inquiry used to determine whether word marks are generic is also relevant to determine whether trade dress is generic: first, determine the genus of the goods or services at issue, and second, determine whether the consuming public primarily regards the matter sought to be registered as a category or type of trade dress for the genus of goods or services. *In re Odd Sox*, 2019 USPQ2d at *6. Then, we must assess whether consumers would associate the trade dress primarily with the genus (i.e., the identified goods) or with the producer (Applicant). *Sunrise Jewelry Mfg. Corp. v. Fred S.A.,* 175 F.3d 1322, 50 USPQ2d 1532, 1536 (Fed. Cir. 1999) (asking whether consumers would associate the "metallic nautical rope design" at issue with the product category "rather than with Fred's specific line of products").

With regard to the first step in the inquiry, Applicant and the Examining Attorney agree that the genus of the goods may be defined by the identification of goods, which in the case before us is "handbags".[16] *See In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1636 (Fed. Cir. 2016) (characterizing as the "correct approach" the Board's conclusion that the genus of the services at issue was adequately defined by the wording "restaurant services" in applicant's identification of services).

---

[16] Applicant's brief, p. 9 (13 TTABVUE 14); 15 TTABVUE 7.

With regard to the second step in the inquiry, the relevant public refers to the ordinary consumers who purchase the identified goods, i.e. handbags.[17] *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1350-51 (TTAB 2013) (citing *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1553-54 (Fed. Cir. 1991). Because there are no restrictions or limitations to the channels of trade or classes of consumers for Applicant's identified goods, the relevant consuming public consists of the public at large, namely, ordinary consumers who purchase handbags. Therefore, we consider the evidence of record regarding the primary significance of the proposed mark to those consumers.

### 1. The Evidence of Record

Our review of the record evidence focuses on the handbags that bear the most resemblance to Applicant's proposed mark[18] and can generally be broken down into the following categories:

(1) identical or nearly identical[19] bags sold on third-party reselling platforms immediately prior to Applicant's launch date;

---

[17] Applicant's brief, p. 9 (13 TTABVUE 14); 15 TTABVUE 7.

[18] Applicant argues that some of the evidence of record "bear[s] no resemblance to the Ark Bag". Applicant's brief, p. 12, part (i) (13 TTABVUE 17). It is true that in support of the functionality refusal, the Examining Attorney referred to dissimilar bag designs to prove certain elements of the functionality refusal. However, this opinion relies on handbag designs that are identical or nearly identical to the proposed mark. To avoid any confusion on this point, many images of the third-party handbags are included herein.

[19] Some of the third-party handbags discussed herein may have minor differences when compared to the Ark bag shown in Applicant's drawing; however, the small differences in appearance between the proposed mark and the third-party handbags are not noteworthy, do not change the overall commercial impression, or cause them to be dissimilar. *See Stuart Spector*, 94 USPQ2d at 1567-68 ("It is simply not reasonable to conclude that the average consumer of guitars, which would include non-musical parents buying a guitar for their child,

(2) commentary about identical or nearly identical handbag designs made prior to Applicant's launch date on websites, in posts, on blogs and the like;

(3) articles promoting a spring/summer fashion collection and featuring a nearly identical handbag design prior to Applicant's launch date;

(4) Applicant's own acknowledgements that the proposed mark is a copy of a common design;

(5) evidence of the historical nature of the design in the form of both an excerpt from a book about the history of handbags and also comments about the proposed mark made by the Museum of Modern Art ("MoMA");

(6) articles by persons with substantial experience in the fashion industry who confirm that the design is a known design and that it originates from multiple sources;

(7) posts by ordinary consumers who comment on their longtime familiarity with an identical or nearly identical bag design and that it emanates from multiple sources; and

(8) identical or nearly identical handbag designs offered by others after Applicant's launch date but prior to it gaining popularity.

Each of these is discussed in turn below.

First, the record shows that third-parties offered identical or nearly identical handbags for sale in the United States prior to Applicant's first use date. For example,

_____

could distinguish one guitar from another based solely on a millimeter of difference in the body shape.").

four third-parties sold a nearly identical bag on Etsy.com in the years 2010,[20] 2011,[21] and 2012,[22] which is a three-year period immediately preceding Applicant's January 27, 2013 date of first use.[23] Pertinent screen shots are shown below, where the sale date for each has been highlighted in yellow for easy reference:



---

[20] Oct. 16, 2020 Office Action at TSDR 23-25 (emphasis added).

[21] *Id.* at 14-16 (emphasis added).

[22] *Id.* at 9-13, 17-20 (emphasis added).

[23] Applicant seeks to discredit the evidence from Etsy.com asserting that the so-called "vintage" products for resell are actually consumers attempting to resell used products, that claims of "vintage" cannot be substantiated, and that these reseller platforms are notorious for trafficking in counterfeit merchandise. Applicant's Brief, pp. 13, 21 (13 TTABVUE 18, 26). None of Applicant's arguments diminish the persuasive value of the evidence discussed above because the screen captures shown are for handbags sold **prior to** Applicant's first sale date. Because these resellers could not have known about Applicant's Ark bag at the time their sales were made, these products could not have been counterfeits. Further, the characterization of the bags as "vintage" is irrelevant, as we are concerned only with the similarity of the bag shown compared to the applied-for mark.





Second, three websites displayed and discussed a nearly identical bag prior to Applicant's first use date:

> o A nearly identical bag was displayed on Thingummery.blogspot.com on April 9, 2012: [24]



---

o A nearly identical design was pictured on the site ArtisanLiveLoveLook.blogspot.com on June 28, 2011: [25]



---

[25] Oct. 16, 2020 Office Action at TSDR 21-22 (emphasis added).

- o On January 26, 2013 on the website KonaDlicious.blogspot.com, the author posts a photograph of a nearly identical bag, albeit one to which she has attached some fruit sprigs:[26]





Birdcage bamboo purse that I've attached some vintage 50's fruit sprigs onto.

---

[26] Apr. 30, 2021 Denial of Req. Recon. at TSDR 29-30.

Third, a nearly identical bag was part of the David David Spring 2010 Ready-To-Wear Collection that premiered in the Fall of 2009. The record shows that the US fashion magazine Elle.com posted an article about it on September 19, 2009 describing the line and including a photograph of the nearly identical bag:[27]



Similarly, "British Vogue" reviewed the same David David collection on its site at vogue.co.uk on September 19, 2009 and included a different photo of the same bag:[28]

---

[27] Oct. 16, 2020 Office Action at TSDR 26 (emphasis added).

[28] Jul. 5, 2018 Office Action at TSDR 27-35 (emphasis added).

Applicant argues that an additional close-up image of the handbag, which appears in the record at, for example, Jan. 2, 2019 Office Action at TSDR 36 (referred to by Applicant as 20 TTABVUE 30), is not properly of record as it has no URL or date of access. Applicant's brief, p. 13, part (v) (13 TTABVUE 18). We construe this as an objection and sustain it.



Fourth, early in Applicant's launch history, Ms. Larian was quoted stating that the proposed handbag design was a reproduction of a common Japanese bag design and similar statements were made by Applicant itself in its advertising/promotional materials and on its website:

- o Archived excerpts from Applicant's own website dated September 23, 2015[29] and September 21, 2016,[30] each of which describes the Ark bag as "a reproduction of a classic Japanese picnic bag."

- o A photocopy of an actual informational card included with Applicant's goods states that "This CULT GAIA bamboo handbag is a reproduction of a classic Japanese picnic bag."[31] Similarly, a

---

[29] Mar. 12, 2020 Office Action at TSDR 7.

[30] Apr. 30, 2021 Denial of Req. for Recon. at TSDR 41.

[31] Mar. 12, 2020 Office Action at TSDR 8.

Applicant argues that the product insert card has no probative value and is not properly part of the record because there is no indication as to the source of the document or information as to when it was created, accessed or published. Applicant's brief, p. 13, part (v) (13

YouTube reviewer unboxing her Ark bag on a post dated December 31, 2016 reads her enclosed informational card to the viewer, which contains identical language.[32]

o In a Who What Wear Australia post at whowhatwear.com.au, Applicant's founder stated that the design was "'a reproduction of a Japanese bag that was popular in the '40s'[ ]".[33]

o In an InStyle magazine article, Applicant's founder was quoted stating that her inspiration for the design "came from this vintage bamboo bag [she] found" and the article goes on to describe the founder's efforts to find "the right way to reproduce it."[34]

Fifth, the record also includes evidence of the design's longstanding and historical nature:

o An excerpt from the book BAGS: A SELECTION FROM THE MUSEUM OF BAGS AND PURSES, AMSTERDAM, published in 2011, showing that the bag design dates back to 1974, albeit assertedly of Italian (not Japanese) origin, as shown below:[35]



---

TTABVUE 18). We construe this as an objection and overrule it. The Examining Attorney explained that the image of the card is a photograph of a product insert card included in one of Applicant's packages, taken by the Examining Attorney. Mar. 12, 2020 Office Action at TSDR 3; Oct. 16, 2020 Office Action at TSDR 4; 15 TTABVUE 14, n.39. As it was not obtained from the Internet or taken from a database, the requirements to include a URL and date of access are not relevant. As this evidence was obtained first-hand by the Examining Attorney, it is properly of record. As it relates directly to the issues at hand, it is relevant.

[32] Oct. 16, 2020 Office Action at TSDR 33.

[33] *Id.* at TSDR 30.

[34] Apr. 2, 2018 Response to Office Action at TSDR 126.

[35] Aug. 1, 2019 Office Action at TSDR 9-12, a color of copy of which was subsequently provided by Applicant in its Feb. 3, 2020 Req. Recon. at TSDR 25-28.

> o Museum of Modern Art ("MoMA") sold genuine Ark bags. Notably, in the comments section titled, "why we chose this", the museum notes that it was selected because it is a "traditional Japanese lunch bag" that has been "reinterpreted into a contemporary handbag …".[36]

Sixth, the record contains printouts of articles by persons with substantial experience in the fashion industry, who confirm that the design originates from multiple sources, including:

> o In a NY MAGAZINE column titled, "The Strategist", which is written by Alison Freer, a NEW YORK TIMES best-selling fashion author with an extensive background in fashion,[37] Ms. Freer wrote a column about the Ark bag. She began by noting that "**I see these 1950s fan-shaped bamboo bags in vintage stores all the time.** They're often called birdcage bags …". Ms. Freer writes that "while Cult Gaia has become proprietary over the design of the bag, **the truth is that it's actually existed for quite some time** (and for much less than $158)." Ms. Freer concludes, "So in fact my 'ripoff' isn't a ripoff at all, but a well-priced, well-made iteration of **a long-standing design**."[38]

> o In a blog post from DebutanteClothing.com, the author wrote, "So here's the gist – **Cult Gaia makes these reproduction Japanese bamboo bags. Women in the Rockabilly and Tiki scene have owned them for decades. You used to be able to buy them vintage until Cult Gaia started reproducing them. Verbtim. [sic] Not inspired. But exact copies**…."[39] The author, who owns

---

[36] Oct. 5, 2017 Office Action at TSDR 60-61.

[37] The record includes evidence that Ms. Freer is knowledgeable about fashion and accessories. She is the author of the book HOW TO GET DRESSED: A COSTUME DESIGNER'S SECRETS FOR MAKING YOUR CLOTHES LOOK, FIT, AND FEEL AMAZING (Oct. 16, 2020 Office Action at TSDR 39) and her LinkedIn profile appears at *id.* at 45.

Applicant complains that in connection with this media coverage and others like it, the Examining Attorney focuses only on the comments that support the refusal of genericness, for example, without focusing on the portions that support the Applicant's claim of acquired distinctiveness. Applicant's brief, p. 12, part (ii) (13 TTABVUE 17). To the extent that this is an objection, it is overruled. This media coverage is relevant to both issues, so it is reasonable for the Examining Attorney to emphasize one portion of it while Applicant simultaneously tries to distract from that and emphasize a different portion.

[38] Jan. 2, 2019 Office Action at TSDR 22-26 (emphasis added).

[39] Oct. 16, 2020 Office Action at TSDR 46-47 (emphasis added).

a vintage clothing shop in Pomona, California, notes that designers often shop vintage stores "not for design inspiration, but for exact copies."[40]

o In a post on PurseBlog.com dated August 16, 2017, the author notes that the Ark bag was "inspired by Japanese picnic baskets."[41]

o In a post in Women's Style at howtospendit.ft.com, titled "A Modern Minimalist Bamboo Bag," the subtitle reads: "Cult Gaia's Ark design evokes classic Japanese picnic baskets from the 1940s".[42]

Seventh, the record also includes many comments by ordinary consumers, who, when presented with a handbag embodying the proposed mark or a nearly identical design, remarked that they recognized it as a common design with which they were long familiar and that emanates from numerous sources. A representative sampling of such comments is set out below:

o In comments to a post on a Marie Claire magazine Instagram account, one follower wrote that she bought the "same bag" in the late 70s, and another wrote that her mother had the "very same bag" in 1977.[43]

o In comments to a review of Applicant's bag on BetweenNapsOnThePorch.net, multiple followers indicate that the design has been around for decades.[44]

o In comments to a Purseblog.com review of the Ark bag, some posts read:

---

[40] *Id.* at 47-49.

[41] Oct. 16, 2020 Office Action at TSDR 57.

[42] Oct. 5, 2017 Office Action at TSDR 43.

[43] Apr. 2, 2018 Response to Office Action at TSDR 78.

[44] Apr. 30, 2021 Denial of Req. Recon. at TSDR 36-37.

- ▪ "So funny…my girlfriends and I carried these in late 70s through 80s…. Back then it wasn't called the "cult Gaia" but it was the EXACT SAME BAG. Hilarious."[45]

- ▪ "I own this bag…well, the original vintage version that this bag was inspired by…. Flash forward 8 yrs later and this brand has come out with an exact replica."[46]

- ▪ "I had a bag like this over 40 years ago when I was in the 4th grade."[47]

- ▪ "I bought the original version of this purse in Honolulu in the 80's …."[48]

- ▪ "This bag was not 'inspired' by a Japanese picnik [sic] basket, it was replicated exactly."[49]

- o In comments to a YouTube review of the Ark bag, several persons commented that the bag design has been known for decades.[50]

Eighth, between the dates of Applicant's first use and the bag becoming the "It" bag in 2017, nearly identical bag designs were offered for sale by various third parties:

- o Amazon.com listed a nearly identical design that was first available on May 20, 2013.[51]

---

[45] Oct. 16, 2020 Office Action at TSDR 62.

[46] *Id.*

[47] *Id.* at 63.

[48] *Id.*

[49] *Id.* at 64.

[50] *Id.* at 33-35 (For example, "I've had this bag forever…").

[51] Apr. 30, 2021 Denial of Req. Recon. at TSDR 5-7. In its reply brief, Applicant argues that some of the evidence of third-party use concurrently with Applicant's is infringing use and that, for example, one of the parties, General Store, had been sent a cease and desist letter. Applicant's Reply brief, p. 4, n.3 (16 TTABVUE 6). For clarity, the evidence regarding the handbag offered by General Store has not been relied upon in this decision.

> o On Etsy.com, multiple third parties listed nearly identical bags on July 2, 2014,[52] May 9, 2015,[53] and June 6, 2016.[54]

### 2. Analysis

As stated above, genericness may be found where the design is so common in the industry that it cannot be said to identify a particular source. The record shows that in the decades leading up to and the years immediately preceding Applicant's first use date - and even concurrently with Applicant's use - consumers in the United States have been exposed to handbags embodying the proposed mark and emanating from multiple third parties. The Examining Attorney has presented substantial evidence that third parties have sold, offered for sale, and/or otherwise advertised, discussed or promoted identical or nearly identical handbags prior to and concurrently with Applicant's use, and that consumers have seen identical or nearly identical handbags emanating from parties other than Applicant since at least the 1940s and recognize Applicant's mark as a common design. The evidence of record also shows that consumers have been exposed to identical or nearly identical designs from websites and publications outside of the United States, which exposure influences US consumers' perception.

Indeed, even Applicant acknowledged that the bag embodying the proposed mark is a reproduction of a common bamboo handbag design. For example, Applicant's own

---

[52] Apr. 30, 2021 Denial of Req. Recon. at TSDR 12-15.

[53] *Id*. at 16-19.

[54] *Id*. at 20-23.

website described its bag as "a reproduction of a classic Japanese picnic bag."[55] Ms. Larian was quoted in an InStyle magazine article stating that the bag was a reproduction of a common Japanese bag design and she described in detail her efforts to find "the right way to reproduce it."[56] A similar quote was attributed to her by Who What Wear Australia.[57] Notably, Applicant in its brief does not deny that Ms. Larian made the statements. We also note that evidence of record shows that while Ms. Larian was initially talkative about her inspiration for the Ark bag, she became more secretive about it over time, eventually refusing to discuss it.[58]

Applicant argues that the evidence of Applicant's own acknowledgements of the origin of the proposed mark – and other Internet evidence set out above – is inadmissible hearsay. We construe this argument as an objection and overrule it. Although under Trademark Rule 2.122(a), 37 C.F.R. § 2.122(a), inter partes proceedings are governed by the Federal Rules of Evidence, including the rule against hearsay, Fed. R. Evid. 802, there is no corresponding evidence rule for ex parte proceedings. *See, e.g., In re Epstein*, 32 F.3d 1559, 31 USPQ2d 1817, 1821 (Fed. Cir. 1994) (hearsay rule inapplicable in ex parte examination). We still may consider the hearsay nature of evidence in assessing its probative value in an ex parte proceeding, but the Board frequently has noted that it "'generally takes a somewhat more

---

[55] *Id.* at 41.

[56] Apr. 2, 2018 Response to Office Action at TSDR 126.

[57] Oct. 16, 2020 Office Action at TSDR 30.

[58] Apr. 16, 2021 Req. Recon. at TSDR 122 ("[Ms. Larian] doesn't discuss the bag's inspiration, but Moda Operandi notes that it comes from a Japanese picnic bag.").

permissive stance with respect to the admissibility and probative value of evidence in an ex parte proceeding than it does in an inter partes proceeding ....'" *In re Canine Caviar Pet Foods, Inc.*, 126 USPQ2d 1590, 1597 (TTAB 2018) (quoting TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) §1208 (2017)).

In addition, third-party posts and comments thereto, for example, published on the Internet are relevant to consumer perception of the applied-for mark, apart from the underlying truth of the content of such posts and comments. *See In re Embiid*, 2021 USPQ2d 577, at \*2 n.19 (TTAB 2021); *see also In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) ("Internet evidence is generally admissible and may be considered for purposes of evaluating a trademark."); *In re I-Coat Co., LLC*, 126 USPQ2d 1730, 1733 (TTAB 2018) ("Material obtained through the Internet generally is acceptable as evidence in ex parte proceedings.").

More particularly, because website contents and posts, and comments thereto, are accessible by the consuming public, they constitute evidence of public exposure to and public perception about the common nature of the handbag design. *See, e.g., In re Mr. Recipe, LLC*, 118 USPQ2d 1084, 1094 n.4 (TTAB 2016) (stories found on the Internet are probative of the perceptions of the authors and of the content received by the readers); *In re Fitch IBCA, Inc.*, 64 USPQ2d 1058, 1060 (TTAB 2002) (website content constitutes evidence that the public may be exposed to certain terms or phrases); *see In re Wal-Mart Stores, Inc.*, 129 USPQ2d 1148, 1157 (TTAB 2019) (examining attorney not required to establish that a particular online source or website "has significant web traffic" to establish its competence just as there is no requirement to

establish the circulation or actual readership of a magazine or newspaper; applicants are free to challenge the probative value of a particular website and even websites that are not frequently visited may demonstrate how the authors use the term and how it will be perceived by the readers).

Applicant argues that even if some Internet evidence is generally accepted as competent evidence in ex parte matters, it does not follow that every piece of information found online is itself competent evidence. Applicant contends that competent evidence does not include "random third-party anonymous comments, or statements by sellers on various ecommerce platforms hoping to drive traffic by placing uncorroborated and self-serving labels of 'vintage' and 'Japanese' or even 'Cult Gaia' to their advertisements."[59] Applicant's arguments are unpersuasive. The Etsy.com listings described above were selected because the bags shown were sold prior to Applicant's first use date; therefore, they could not have been trying to benefit from the popularity of Applicant's Ark bag, and it is hard to understand how characterizing the bags as "vintage" or "Japanese" would have been self-serving.

Also, Applicant's arguments that the comments are not competent because they are "random third-party anonymous comments" is equally unpersuasive. We are unaware of and Applicant has not cited to any precedential decision that articulates a blanket prohibition on considering comments to re-selling platforms in an ex parte matter. Further, it is undisputed that these third-party re-selling platforms, such as Etsy.com, are publicly available and therefore provide additional insight into the

---

[59] Apr. 16, 2021 Req. Recon. at TSDR 25 n.3.

public's perception of Applicant's applied-for mark and the corresponding identified goods as used in the marketplace.

Also, it is important to note that Applicant's position with regard to comments on the issue of genericness is inconsistent with Applicant's arguments in support of its claim of acquired distinctiveness. For example, Applicant's counsel submitted a declaration, attaching to it screenshots of "YouTube videos discussing or reviewing the Ark Bag, **as well as comments that discuss the popularity and uniqueness of the bag**."[60] As Applicant relies on anonymous consumer comments in support of its position on the issue of acquired distinctiveness, it is only fair that the Examining Attorney should similarly be able to rely on anonymous consumer comments in support of the USPTO's arguments on the issue of genericness. *Cf. Sentrol, Inc. v. Sentex Sys., Inc.*, 231 USPQ 666, 667 (TTAB 1986) (the goose-gander rule: generally, a party may not be heard to argue that a discovery request propounded by its adversary is improper when the party itself previously served a substantially identical request).

Turning back to the evidence of record, as mentioned, the record includes a photocopy of an informational card included with Applicant's goods that states "This CULT GAIA bamboo handbag is a reproduction of a classic Japanese picnic bag."[61] An identical card was read to the viewer in a YouTube review of the Ark bag dated

---

[60] Apr. 16, 2021 Req. Recon., Medenica Decl. ¶14 at TSDR 75 and Exhibit 12 thereto (emphasis added).

[61] Oct. 16, 2020 Office Action at TSDR 32.

December 31, 2016.[62] We find the evidence of Ms. Larian's statements, the product insert card, the archived pages of Applicant's website and the YouTube review to be quite probative on the issue of genericness.

During the application prosecution phase, the Examining Attorney requested information about Applicant's use of the product insert card, including the dates during which the card was included in Applicant's packaging. Applicant sought to discredit the product insert card evidence by proffering two declarations. Interestingly, both declarants provide identical testimony on this topic. First, Brooke Cainkar, VP of Operations for Applicant since 2012,[63] testified in pertinent part:

> 12. I have reviewed **our files** and can state that information pertaining to physical goods inserts, brochures, manuals or other information is maintained in the Company e-mail records, and goes back to 2016. In my review, the only item I came across was one image of an insert attached to an email that the company received from a third-party company in June 2016. See Exhibit B.[64] However, I have no information in **my** files as to whether this is an insert that was created by the Company or actually used by the Company in distributing goods.[65]

This testimony is not persuasive as Ms. Cainkar's search efforts are at best inconclusive and her conclusions are at worst evasive. First, the initial sentence suggests that she has reviewed all of Applicant's files, i.e., "our" files, and that this information only goes back "to 2016," which is vague, and which is three years after Applicant's date of first use, so it is an inconclusive search. As the YouTube review

---

[62] *Id*. p. 33.

[63] Apr. 16, 2021 Req. Recon. at TSDR 36.

[64] We note that Exhibit B is identical to the card proffered as evidence by the Examining Attorney.

[65] Apr. 16, 2021 Req. Recon., Cainkar Decl. ¶12 at TSDR 38-39 (emphasis added).

was posted on December 31, 2016, it is likely that the Ark bag, together with any product inserts, would have been packaged at least weeks if not months prior to the review date. Further, Ms. Cainkar qualifies her substantive response by limiting it to "my" files, suggesting that her response is based on a subset of information available. Finally, this testimony falls short in that Ms. Cainkar does not explain why Applicant's files do not date back at least to the date of first use, and Applicant does not offer a second declarant to complete the timeline or fill in any gaps. In short, Ms. Cainkar offers no substantive explanation or response to the Examining Attorney's inquiry.

Curiously, the testimony by Chief Operating Officer Jenny Oh is identical to Ms. Cainkar's testimony on this point (with an obvious change to an Exhibit designation).[66] Ms. Oh's testimony is equally unpersuasive for the same reasons. The probative value of both declarations is simply belied by the record evidence which goes unrefuted.

Seeking more details about Applicant's archived webpage where Applicant itself described the Ark bag as a reproduction of a classic Japanese picnic bag, the Examining Attorney requested information regarding the dates that Applicant's website referred to its Ark bag as (1) a reproduction, (2) classic, or (3) Japanese in style or origin.[67] Ms. Cainkar was again purposely evasive. Keeping in mind that the

---

[66] Sep. 14, 2020 Response to Office Action, Oh Decl. ¶ 7 at TSDR 57.

[67] Apr. 16, 2021 Req. Rec., Cainkar Decl. ¶5 at TSDR 37.

language shown on the archived page appears on September 23, 2015[68] and stops appearing on or after September 21, 2016,[69] Ms. Cainkar responded that:

> 6. I have reviewed our files and can state that such information is maintained in **the Company's electronic files and goes back to approximately March 2017**. In describing the Ark Bag trade dress design, I did not see any mention of the word "reproduction" or that the Ark Bag is Japanese in style or origin for this time frame. To the extent such information could have been included prior to March 2017, **I do not have knowledge because I do not have such information in my files**.[70]

Again, her conclusion appears to be based only on the information in her files, not the entirety of the Company's files, to which, as COO, she has complete access. There is no explanation as to why Ms. Cainkar restricts her search or why the records date only to a time frame that does not overlap with the date for which use of the target language is known to have occurred. Further, Ms. Cainkar does not explain why Applicant, formed in 2011 during the digital age, only has electronic files going back to approximately March 2017. Despite Ms. Cainkar's weak testimony, Applicant does not offer another declarant to complete the time frame or broaden the search to include the remainder of Applicant's electronic files. Indeed, it is hard to understand why Applicant even proffered Ms. Cainkar's testimony on this issue (and the one previously discussed) as her testimony fails to substantively address the issues. Consequently, because Applicant evades answering the Examining Attorney's

---

[68] Mar. 12, 2020 Office Action at TSDR 7.

[69] Apr. 30, 2021 Denial of Req. for Recon. at TSDR 41.

[70] Apr. 16, 2021 Req. Rec., Cainkar Decl. ¶6 at TSDR 37 (emphasis added).

question directly, we find her testimony on this topic unfavorable to Applicant. For these reasons, the testimony of Ms. Cainkar is not persuasive.

To the extent Ms. Larian herself in her interviews, or Applicant on its archived website page, describe the Ark bag as a reproduction of a Japanese bamboo bag, Applicant argues that the Examining Attorney's characterization of this as an "admission" that the bag is a known bag design and, thus, generic is a "remarkable conclusion"[71] and that there is "absolutely no precedent or support for [it]".[72] As an initial matter, Applicant argues, any characterization of the bag as a reproduction of a "Japanese" bamboo bag is inaccurate because, "such bamboo bags never existed in Japan."[73] To counter Applicant's founder's own statements, Applicant relies on the "expert" Declarations of Peter Grilli and Aneta Genova.[74]

Mr. Grilli is a renowned expert on Japanese artifacts.[75] He is the President Emeritus of the Japan Society of Boston, having served in that position from 2000-2013.[76] Mr. Grilli is also a consultant, specializing on Japan and relations between Japan and the United States, with a focus on cultural affairs, film, performing arts, education, media and inter-cultural communications.[77] However, Mr. Grilli admittedly is not an expert in fashion and has "**no knowledge of handbags,** fashion

---

[71] Applicant's Reply brief, p. 5 (16 TTABVUE 7).

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] Applicant's brief, p. 12 (13 TTABVUE 17).

[76] Apr. 16, 2021 Req. Recon., Declaration of Peter Grilli ("Grilli Decl.") ¶5 at TSDR 54.

[77] *Id.*

design, or other matters relating specifically to the 'Ark Bag' ...."[78] Therefore, due to his lack of first-hand knowledge and due to Covid constraints, Mr. Grilli consulted, inter alia, with "colleagues or friends with knowledge of ... Japanese fashion ... for their information or opinions regarding the 'Ark Bag' and its possible Japanese origins"[79] and concludes, "I seriously doubt the authenticity of the 'Vintage Japanese' iteration or the accuracy of that label. [The Ark bag] does not seem 'Japanese' in any way, aesthetically or culturally."[80] This is far from persuasive testimony.

The characterization of the bag as "Japanese" provides context, but it is not central to the refusal, nor is it an attempt at a cultural-appropriation type refusal.[81] It is merely an attempt by the Examining Attorney to refer to the bag by its common commercial name consistent with the name generally used by others, as shown by the extensive evidence of record. We agree with the Examining Attorney that, regardless of whether consumers regard the design as of Japanese origin or otherwise, the record evidence shows that consumers recognize that the design emanates from multiple sources. Mr. Grilli's testimony that the bag "does not seem 'Japanese' in any way," is unpersuasive and does not negate the persuasive value of the evidence of third-party uses of and references to a similarly-shaped bag from other sources.

Additionally, Applicant seeks to diminish the persuasive value of its founder's statements and website advertising by proving through the expert declaration of

---

[78] *Id.* at ¶15 at TSDR 57 (emphasis added).

[79] *Id.* at ¶20, at TSDR 58-59.

[80] *Id.* at ¶26, at TSDR 72.

[81] Applicant's brief, p. 10 (13 TTABVUE 15).

Aneta Genova that the Ark handbag design is not a common "category" of handbag design because it defies categorization, i.e., clutch, birdcage, picnic, etc.[82] Specifically, Applicant argues that there is no evidence to support the conclusion that the Ark bag design is a trade dress for "handbags" generally, or for "birdcage" or "Japanese bamboo" bags specifically.[83] Applicant argues that because there is no universal name for the type of handbag shown by its applied-for mark, the handbag in turn cannot be so common as to be generic.

To support its position, Applicant proffers the declaration of Ms. Aneta Genova, who has an extensive background in fashion and accessories, including handbags.[84] Ms. Genova testified that the Ark bag "does not constitute a category or common style of handbag".[85] Ms. Genova explains that there are general categories of handbags that are recognized as classic shapes and styles, such as tote bags, envelope bags, clutch bags, duffel bags, etc.[86] These common shapes and styles are also recognized in other publications.[87] However, the Ark bag is not shown as a category in any of these sources. Thus, Applicant argues, assuming that "handbag" is too broad a genus, the Ark bag trade dress does not fit into any known category of "handbags."[88]

---

[82] Applicant's brief, p. 11 (13 TTABVUE 16).

[83] *Id.*

[84] Apr. 16, 2021 Response to Office Action, Declaration of Aneta Genova ("Genova Decl.") ¶¶5-15, at TSDR 361-65.

[85] Genova Decl. ¶18 at TSDR 365.

[86] *Id.* ¶20 at TSDR 366-73.

[87] *Id.* ¶21 at TSDR 374.

[88] Applicant's brief, p. 12 (13 TTABVUE 17).

Ms. Genova arrived at her opinion after conducting "extensive research" and "review[ing] many books", including those listed in her declaration and on the exhibit attached to it.[89] However, Ms. Genova did not review some of the most probative evidence on this topic. That is, she testified that her research included an extensive electronic search of the records of the Metropolitan Museum of Art (the "MET"),[90] for example, but did not include MoMA, where evidence was already of record regarding the common nature of bags embodying the mark.[91] Consequently, we find that Ms. Genova's testimony fails to consider some of the most probative evidence, and is therefore unpersuasive.

Further, we note that the two-part test requires only that we identify the genus of the goods. *See In re Cordua Rests.,* 118 USPQ2d at 1636. Here, both Applicant and the Examining Attorney agree that it is "handbags".[92] We are not obligated nor is there a reason to further define it by way of "category" or "national origin".

Turning back to Ms. Larian's own comments in interviews and to the statement on Applicant's archived website, we find that these statements are highly probative on the issue of genericness as Ms. Larian and, in turn, Applicant, would know best the source of the inspiration for Ms. Larian's design. *See In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1112 (Fed. Cir. 1987) (Gould's own submissions, i.e., its specimen and marketing brochure, provided "the most damaging evidence" that its

---

[89] Apr. 16, 2021 Response to Office Action, Genova Decl. ¶¶17-18 at TSDR 365-66.

[90] *Id*. ¶¶24-31 at TSDR 374-75.

[91] Oct. 5, 2017 Office Action at TSDR 60-61.

[92] Applicant's brief, p. 9 (13 TTABVUE 14); 15 TTABVUE 7.

alleged mark is generic and would be perceived by the purchasing public as merely a common name for its goods rather than a mark identify the source of the goods).

Turning back to Applicant's brief, Applicant argues that to the extent that the Examining Attorney relies on evidence in the form of books, websites or posts that may target a primary audience outside the United States, such evidence has no relevance to the US market, which we construe as an objection. This evidence includes (1) the review of the David David collection as featured in British Vogue, and (2) excerpts from the BAGS book from a museum in Amsterdam.[93]

We are cognizant that the "probative value, if any, of foreign information sources must be evaluated on a case-by-case basis." *In re Bayer Aktiengesellschaft*, 82 USPQ2d at 1835. The issue before us is whether consumers are aware that the design is common and emanates from more than one source. In that regard, English language material obtained from foreign websites, for example, has been accepted as competent evidence in trademark examination when it is likely that U.S. consumers have been exposed to the website or news source. *See id.* (finding foreign website or foreign news publication evidence carries some probative value as to prospective consumer perception in the United States because of the "growing availability and use of the internet as a resource for news, medical research results, and general medical information"); *In re Odd Sox LLC*, 2019 USPQ2d *15; *In re Well Living Lab Inc.*, 122 USPQ2d 1777, 1781 n.10 (TTAB 2017) (finding foreign website evidence relevant because potential consumers would likely encounter those English language

---

[93] Applicant's brief, p. 13, part (vi) (13 TTABVUE 18).

websites when searching for companies offering services similar to applicant); *In re IBM Corp.*, 81 USPQ2d 1677, 1681 n.7 (TTAB 2006) (finding foreign website evidence probative for computer hardware because professionals in highly technical fields such as medicine, engineering, computers, and telecommunications are likely to utilize all available resources, regardless of country of origin or medium). We find the English-language sources, British Vogue and the BAGS book, to qualify as such – sources to which US consumers likely have been exposed.

The evidence of record establishes the international nature of the fashion industry. For example, Ms. Larian testified that handbags embodying the proposed mark have become increasingly popular throughout the United States, "and in fact throughout the world."[94] Fashion Week is hosted around the world in Paris, London, New York, Florence and Milan[95] and US fashion magazines cover Fashion Week in all major international cities.[96] Indeed, an article in Style magazine featuring Applicant and its product line, including its Ark bag, includes a photograph of a guest clutching an Ark bag while attending Paris Fashion Week.[97] Also Applicant made of record social media posts from residents of foreign countries and posts by influencers traveling abroad who pose with or post about the Ark bag [98] to support its claim of

---

[94] Apr. 2, 2018 Response to Office Action, Larian Decl. ¶6 at TSDR 29.

[95] Oct. 16, 2020 Office Action at TSDR 65-71.

[96] *Id.*; Jul. 1, 2019 Response to Office Action at TSDR 794, 1160.

[97] Apr. 16, 2021 Req. Recon., Exhibit 1 to the Medenica Decl., at TSDR 132.

[98] Apr. 16, 2021 Req. Recon., Exhibit 4 to the Medenica Decl., at TSDR 146, 157, 161, 166, 168, 178, 183, 195, 207, 210, 218; Jul. 1, 2019 Response to Office Action at TSDR 715 ("witness the [Ark bag] on stylish women in Paris, Milan, New York and Stockholm"), 896-901, 1147

acquired distinctiveness. While such foreign activity does not support its claim that the mark has acquired distinctiveness in the United States, it does show the international nature of fashion. The same is true of the unsolicited media coverage of the Ark bag by foreign magazines and other publications (as determined by the country code in the URL), which also feature Applicant's Ark bag, such as two articles on Who What Wear Australia,[99] In Style Australia,[100] Vogue Australia,[101] Vogue India,[102] Vogue UK,[103] Elle Australia,[104] Marie Claire UK,[105] Marie Claire Australia,[106] Image Ireland,[107] The Irish Times,[108] Harper's Bazaar Australia,[109] and Pinterest Australia.[110] Applicant also made of record evidence of its collaboration with the luxury Brazilian label Adriana Degreas.[111] Consequently, we overrule the objection, allow the evidence of foreign activity and find it relevant and probative on

---

(Michelle Williams spotted carrying an Ark bag in Rome), and 1113; Apr. 2, 2018 Response to Office Action at TSDR 67 (ladies holding Ark bag attending Copenhagen fashion week).

[99] Oct. 16, 2020 Office Action at TSDR 30; Jul. 1, 2019 Response to Office Action at TSDR 780.

[100] Jul. 1, 2019 Response to Office Action at TSDR 797.

[101] *Id*. at 309, 838.

[102] *Id*. at TSDR 788-89.

[103] *Id*. at 1036, 1053.

[104] *Id*. at 845.

[105] *Id*. at 850, 962.

[106] *Id*. at 1105.

[107] *Id*. at 860, 957.

[108] *Id*. at 1125.

[109] *Id*. at 928, 940.

[110] *Id*. at 1132.

[111] *Id*. at 674-75.

the issue of genericness as it informs the perception of the general US public. *In re Nieves & Nieves LLC*, 113 USPQ2d 1639, 1642 (TTAB 2015) (finding foreign website evidence relevant because it concerns the perception of the general U.S. public – the relevant consumers of the goods in the application – regarding the identity of a celebrity who lives and travels outside of the United States).

Applicant also argues that the mere fact that a similar design existed in the 1950s and that a similar design existed in Italy in the 1970s does not preclude the Ark Bag from functioning as trade dress in the United States because novelty is not a requirement for trade dress protection.[112] While novelty is not a requirement, it is required that the applied-for mark function as an indicator of source. The evidence of record establishes that the applied-for design is a common handbag design, and like many design trends, it has periods of popularity followed by lulls. Merely because a particular bag design is not currently trending does not mean that it is not a common bag design. The record shows that consumers are still being exposed to and are purchasing identical or nearly identical handbags from multiple reselling platforms, seeing virtually identical handbags in and at fashion shows, in books, and in articles by prominent persons in the fashion industry, for example. As these same handbags continue to be used, sold, displayed, and discussed, and consequently continue to influence consumers' perceptions, the proposed mark would not be viewed as the indicator of a single source, and simply is not capable of indicating source. *Cf. Converse, Inc. v. ITC,* 909 F.3d 1110, 128 USPQ2d 1538, 1547 (Fed. Cir. 2018) (in

---

[112] Applicant's brief, p. 8 (13 TSDR 13).

evaluating the length, degree and exclusivity of Converse's use for determining whether a mark has acquired secondary meaning, "uses older than five years should only be considered relevant if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date.").

### 3. Conclusion as to the Issue of Genericness

From this record, we find that handbags embodying the proposed mark are so common in the industry that such product design is not capable of indicating source and that Applicant's proposed mark is at best a minor variation thereof. Our finding that the proposed mark is generic is an absolute bar to its registration on either the Principal or Supplemental Register. In the interest of completeness, however, and in the event that on appeal the mark were deemed not to be generic, we now discuss the alternative ground for refusal, i.e., that the mark is a nondistinctive product design, and determine whether the evidence of record supports a finding that the applied-for mark has acquired distinctiveness sufficient to make it eligible for registration.

### B. Lack of Acquired Distinctiveness Refusal

"Distinctiveness is acquired by 'substantially exclusive and continuous use' of the mark in commerce." *Stuart Spector,* 94 USPQ2d at 1554 (TTAB 2009) (quoting *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 424 n.11 (Fed. Cir. 1985)). An applicant must show that the primary significance of the product configuration in the minds of consumers is not the product but the source of that product in order to establish acquired distinctiveness. *Stuart Spector*, 227 USPQ2d at 1554.

It is axiomatic that "the lesser the degree of inherent distinctiveness, the heavier the burden to prove that [a mark] has acquired distinctiveness." *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1986 (TTAB 2009). "While there is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, the burden is heavier in this case because it involves product configuration[]." *In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1283-84 (TTAB 2000); *see Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988) (evidence required to show acquired distinctiveness is directly proportional to the degree of nondistinctiveness of the mark at issue).

## A. Acquired Distinctiveness Factors

We weigh six interrelated factors to determine whether a proposed mark has acquired secondary meaning:

(1) Association with a particular source by actual purchasers (typically measured by customer surveys);

(2) Length, degree, and exclusivity of use;

(3) Amount and manner of advertising;

(4) Amount of sales and number of customers;

(5) Intentional copying; and

(6) Unsolicited media coverage of the product embodying the mark.

*Converse, Inc. v. ITC*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018). When the evidence comprises evidence such as the applicant's length and manner of use, it is usually expected that such evidence will be "supplemented by evidence of the

effectiveness of such use to cause the purchasing public to identify the mark with the source of the product." *In re Owens-Corning Fiberglas Corp.*, 227 USPQ at 422.

Further, a showing of acquired distinctiveness need not include all of these types of evidence; no single factor is determinative. Rather, the determination involves assessing all of the circumstances involving the use of the mark. However, in the context of product design marks, it is imperative that the evidence of acquired distinctiveness "relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general." *In re Change Wind*, 123 USPQ2d 1453, 1467 (TTAB 2017) (citations omitted); *see also In re SnoWizard, Inc.*, 129 USPQ2d 1001, 1005 (TTAB 2018) (citations omitted).

### 1. Association with a Particular Source by Actual Purchasers

Applicant does not present a consumer survey or declarations made by consumers themselves. The record does contain evidence consisting of articles and product reviews, and comments thereto made by consumers; however, we address this evidence below in the discussion of unsolicited media attention.

### 2. Length, Degree, and Exclusivity of Use of the Mark

Applicant has offered its Ark bag handbags embodying the mark since at least as early as January 27, 2013.[113] However, this moderately long use of a mark is not necessarily conclusive or persuasive on the issue of acquired distinctiveness, particularly involving a product design mark. *Kohler Co. v. Honda Giken Kogyo K.K.,* 125 USPQ2d 1468, 1515 (TTAB 2017). This is particularly true here, where there is

---

[113] Jul. 1, 2019, Supp. Larian Decl. ¶6 at TSDR 394.

evidence of record that others have offered nearly identical handbag designs both prior to and concurrently with Applicant, as discussed earlier in connection with the issue of genericness. *See id.* at 1515 (long use not persuasive on issue of acquired distinctiveness where the applicant did "not dispute that during much of [the period of use] other general purpose utility engines in the marketplace have had similar configurations").

As for exclusivity of use, Ms. Larian testified that, since she first introduced the handbag embodying the mark, she is not aware of any use of the mark by third parties, except for use that is intended to trade off Applicant's reputation in the mark.[114] However, the record directly contradicts Applicant's position. The evidence of third-party use discussed above in connection with the issue of genericness demonstrates that multiple third-parties offered an identical or nearly identical handbag for sale both before Applicant's launch date and also concurrently with Applicant, i.e., prior to the Ark bag gaining popularity, as shown, for example, by the evidence of the third party re-sellers on Amazon.com and Etsy.com.[115] These third-party uses defy Applicant's claim that its use is "substantially exclusive" such that Applicant's use would support a finding its mark has acquired distinctiveness.

While absolute exclusivity is not required, *see L.D. Kichler Co. v Davoil, Inc.*, 192 F.3d 1349, 52 USPQ2d 1307, 1309 (Fed. Cir. 1999), the widespread use, sale of and discussions/comments about bamboo handbag designs similar to Applicant's applied-

---

[114] Apr. 2, 2018 Response to Office Action, Larian Decl. ¶ 11 at TSDR 30.

[115] Apr. 30, 2021 Denial of Req. Recon. at TSDR 5-7, 12-15, 16-19, and 20-23.

for mark by third parties is inconsistent with Applicant's claim of substantially exclusive use of the design and, ultimately, of acquired distinctiveness. Indeed, the longtime use, sale and discussion (in the form of comments to Etsy.com listings and third-party product reviews, for example) of such handbags shows that Applicant's use is not "substantially exclusive." *See, e.g., Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances.").

### 3. Amount and Manner of Advertising

Applicant uses a number of methods and media to advertise and promote its mark. It advertises and promotes its proposed mark on its website at cultgaia.com[116] and it also relies on both paid and unpaid social media postings featuring the Ark bag.[117] Applicant also gifts the Ark bag to celebrities who are photographed carrying it.[118] As for Applicant's Instagram presence, Applicant's followers have increased with the Ark bag's popularity. As of February 2018, its account had approximately 180,000 followers and contained approximately 815 posts;[119] by June 2019, Applicant had

[116] Apr. 2, 2018 Response to Office Action, Larian Decl. ¶5 at TSDR 29.

[117] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl. ¶¶15, 21 at TSDR 395.

[118] *Id*. ¶15 at TSDR 395.

[119] Apr. 2, 2018 Response to Office Action, Larian Decl. ¶7 at TSDR 29, and Exhibit A at TSDR 33.

460,000 followers and more than 1,430 posts;[120] and by the spring of 2021, it had over 1 million followers and 2,640 posts.[121]

Referring specifically to paid social media, representative examples of sponsored posts are attached as Exhibit 3 to Ms. Larian's supplemental declaration,[122] and Ms. Larian testified that the evidence in Exhibit 3 shows that more than 1,675,000 unique accounts viewed the Ark bag as a result of only nine (9) Instagram advertisements featuring the handbag embodying the proposed mark.[123]

Ms. Larian testified that Applicant's marketing efforts, largely driven by its social media strategy, have been successful, resulting in the Ark bag achieving what multiple third-party media outlets, as well as retailers, have described as "famous," "iconic", or "signature" status.[124]

As for advertising expenses, Ms. Larian testified that Applicant's advertising expenditure for 2016 were $31,872 and rose to $157,079.85 for 2017.[125]

Notably, the collective exhibit of screen shots of Applicant's Instagram posts generally contain photographs of the Ark handbag by itself without any other identifying information.[126] To the extent that trademarks are shown on the posts,

---

[120] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl. ¶17 at TSDR 396.

[121] Apr. 16, 2021 Req. Recon. Medenica Decl. ¶15 at TSDR 75, and Exhibit 13 at TSDR 360-61.

[122] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl. ¶21 at TSDR 396, and Exhibit 3 at TSDR 518-35.

[123] Supp. Larian Decl. ¶21 at TSDR 396, and Exhibit 3 at TSDR 518.

[124] Supp. Larian Decl. ¶¶23, 26 at TSDR 397, and Exhibit 4 at TSDR 536.

[125] Apr. 2, 2018 Response to Office, Larian Decl. ¶9 at TSDR 30.

[126] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl. ¶19 at TSDR 396.

they are the words CULT GAIA, which appear at a minimum in the account name; sometimes this mark appears in the caption, and on occasion other marks such as ARK, and GAIA's ARK also appear.[127] Followers sometimes tag the Ark bag with the CULT GAIA mark.[128]

We also note that there is no "Look for" advertising[129] in the record that calls a consumer's attention to the sunburst-styled, arc-shaped, bamboo design as a source-indicator and, indeed, Applicant intentionally avoids it by engaging in advertising that emphasizes the bag itself. For example, Ms. Larian testified that the Ark bag is "typically promoted by display of an image of the Ark Bag featuring the Ark Bag Trade Dress Design without a label, hangtag, or other external identifier."[130] Ms. Larian continued, stating that "Cult Gaia's advertising and promotional materials prominently [feature] the Ark Bag either by itself, or with an unidentifiable model whose features are omitted."[131]

Applicant argues that it is because it displays its bag without any visible label that the public has become educated in the "key visual cue" i.e., the proposed mark, to identify Applicant's brand.[132] Applicant also argues that media coverage showing

---

[127] Apr. 2, 2018 Response to Office, Larian Decl., Exhibit A at TSDR 33-58.

[128] Apr. 16, 2021 Response to Office Action at TSDR 218.

[129] "Look for" advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. *Stuart Spector*, 94 USPQ2d at 1572.

[130] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl. ¶19 at TSDR 396.

[131] *Id*. at ¶20.

[132] Apr. 2, 2018 Response to Office Action, p. 6-7 at TSDR 20-21.

the Ark bag prominently featured, without any external identifiers, reinforces the acquired distinctiveness of the brand.[133]

However, Applicant undercuts its own evidence on this point. The Examining Attorney argued that because consumers tag CULT GAIA on Instagram, consumers associate the CULT GAIA mark with the applied-for bag design. In response, Applicant argued, "But 'Cult Gaia' is Applicant's business name; Applicant does not conduct business as 'Jasmin Larian LLC.' Moreover, the whole point of tagging a product on Instagram **is to identify it with its source**, where consumers could actually purchase the product – which is precisely why tagging the bag with 'CULT GAIA' serves a source identifying function."[134] Thus, Applicant seems to argue that in fact consumers associate the word mark CULT GAIA with Applicant's applied-for mark and may not identify Applicant as an indicator of source based on a photo of the Ark bag alone.

It is well established that without any advertising directing consumers to the identifiable features of Applicant's bag, typically consumers are unlikely to notice that feature of trade dress design, let alone perceive it as being exclusively associated with a single source. *Kohler*, 125 USPQ2d at 1517 n.97. Despite photographs and posts of the Ark bag by itself and no look-for advertising, the record does contain some evidence that some consumers recognize the Ark bag as emanating from Applicant as discussed in more detail below.

---

[133] Applicant's brief, p. 18, part (vi) (13 TTABVUE 23).

[134] Applicant's Reply brief, p. 9 (16 TTABVUE 11) (emphasis added).

### 4. Amount of Sales and Number of Customers

Applicant's founder, Ms. Larian, testified that sales of handbags embodying the mark have steadily increased since the bag was first introduced in 2013. Sales have increased year over year, and, in the years 2014-19, Applicant sold approximately 122,855 Ark bags, resulting in total sales in excess of approximately $12.7 million.[135] The evidence shows that sales during this time period were highest in 2018, where gross sales revenues exceeded $5.7 million, but dropped in 2019 to $1.5 million.[136] While Applicant provides this relevant sales information, Applicant does not provide any evidence regarding the number of its actual customers (although this was addressed to some extent in connection with the discussion of its social media followers) or overall market context.

We cannot accurately gauge Applicant's level of success without additional evidence as to Applicant's market share or how the Ark bag ranks in terms of sales in the trade. Our precedents have long alerted practitioners to the fact that the absence of evidence of competitive contextual information may limit the probative value that we might otherwise accord advertising and sales numbers in the acquired distinctiveness inquiry. *See, e.g., Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1480 (TTAB 2016); *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107

---

[135] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl., Exhibit 5 at TSDR 1165.

[136] *Id*. Ms. Larian also testified (without corroborating documentation) that by 2017, sales of handbags embodying the mark returned revenue of $4,530,822.52, which is substantially higher. Apr. 2, 2018 Response to Office Action, Larian Decl. ¶10 at TSDR 30. However this sales revenue cannot be reconciled with the sales data included in Exhibit 5 to the Supp. Larian Decl. and is therefore not relied upon here.

USPQ2d 1829, 1838 (TTAB 2013); *Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1681 (TTAB 2007) (sales figures for 14 years, standing alone and without any context in the trade, found insufficient).

Additionally, a high volume of sales does not always equate to a finding of acquired distinctiveness, especially in applications involving marks comprised of product designs, as is the case here. *See e.g., Goodyear Tire & Rubber Co. v. Interco Tire Corp.*, 49 USPQ2d 1705 (TTAB 1998) ($56,000,000 sales revenues and 740,000 tires sold insufficient to show acquired distinctiveness of tire tread design). The commercial success of the product does not necessarily indicate that the product design is recognized as a source-indicator.

### 5. Intentional Copying and Policing Activity

Applicant argues in its brief that, as a result of the Ark bag's widespread popularity, multiple third-parties have intentionally created unauthorized copies of the Ark bag design, and that such copying is evidence of acquired distinctiveness.[137] Applicant also argues that it has been diligent in enforcing its rights. To this end, the record includes two declarations by Ms. Larian, each of which address Applicant's policing efforts. In her original declaration, Ms. Larian's testimony consisted of the following single paragraph:

> I have policed the [Ark bag] Mark, including but not limited to sending cease-and-desist letters to numerous companies. By way of examples only, we sent cease-and-desist letters to the following companies, all of whom agreed to stop distributing or selling their infringing handbags: TJX (owners of TJ Maxx and Marshalls), Vici Branding, Owl Fish, Cynthia

---

[137] Applicant's brief, p. 20 (13 TTABVUE 25).

Rowling, Ana Trading, Versona, Sara Laredo, St. Armand's Designs, Number One Beauty, Vitusing Swimwear, and Wild Dove Boutique.[138]

Notably, Ms. Larian's testimony specifies the "Ark bag" mark, but it is vague to the extent that it references "numerous" infringers, and lacks specificity as to the scope of the infringing activity and if marks other than the proposed mark were infringed.

In her supplemental Declaration, Ms. Larian provided more details but introduced new ambiguities. Ms. Larian testified that Applicant has engaged in "significant" enforcement efforts and has been "largely" successful.[139] Ms. Larian further testified that over the course of an 18-month period, "over 100 sellers have ceased offering bags that infringe the Ark Bag following receipt of a cease and desist letter from Cult Gaia."[140] However, Ms. Larian then undercuts the probative value of that statement by adding, "Multiple third parties to whom Cult Gaia has directed cease and desist correspondence use the terms "Cult Gaia" "Ark" "Arc" – or an image of Applicant's Ark Bag – in their product offerings."[141] Consequently, it appears that infringers are not infringing the Ark bag trade dress alone, but are also infringing the trademarks CULT GAIA, ARK and/or ARC and/or engaging in copyright infringement, or perhaps some combination thereof.

---

[138] Apr. 2, 2018 Response to Office Action, Larian Decl. ¶11 at TSDR 30.

[139] Jul. 1, 2019 Response to Office Action, Supp. Larian Decl. ¶27 at TSDR 397.

[140] *Id.* ¶27 at TSDR 397.

[141] *Id.* ¶28 at TSDR 397-98.

Additionally, Ms. Genova, who testified that the Ark design was not a common handbag design, also testified that infringers copy the Applicant's word marks in addition to the trade dress: "Many of these third party imitators make explicit reference to 'Cult Gaia' or 'Ark Bag' in their listings, which demonstrates that Cult Gaia's Ark Bag Trade Dress is associated with Cult Gaia by the consuming public and the trade."[142] We understand her use of "explicit reference" to mean that infringers are copying the Ark bag's trade dress and also infringing Applicant's traditional trademarks, such as the CULT GAIA and ARK word marks.

Because neither Ms. Larian's nor Ms. Genova's testimony is directed to the applied-for trade dress alone, it is not convincing, as the record is not clear to what extent copiers perceive the trade dress by itself as a source indicator or believe that consumers would rely on the trade dress alone as an indicator of the source of the goods. *In re Fantasia Distrib., Inc.*, 120 USPQ2d 1137, 1145-46 (TTAB 2016); *see also Kohler Co.*, 125 USPQ2d at 1518 (copying of trade dress may not be probative of anything where it is not clear what features were copied).

Additionally, the record is devoid of evidence to corroborate Ms. Larian's testimony about enforcement efforts, such as copies of demand letters, responses thereto, and settlement agreements. Without this evidence, it is difficult to draw any meaningful conclusions about them. For example, there is no evidence of record that the infringers settled or otherwise cooperated in recognition of the acquired distinctiveness of Applicant's Ark bag mark or to simply avoid future litigation. *Ennco*

---

[142] Apr. 16, 2021 Req. Recon., Genova Decl. ¶57 at TSDR 394.

*Display Sys.*, 56 USPQ2d at 1286 ("We are unable to determine from the record whether the parties [settled] in recognition of the acquired distinctiveness of applicant's product configurations, … or in order to settle [the dispute and avoid litigation]."); *In re Wella Corp.*, 565 F.2d 143, 196 USPQ 7, 8 n.2 (CCPA 1977) ("Appellant argues that various letters (of record) from competitors indicating their discontinuance of use of its mark upon threat of legal action are evidence of its distinctiveness, but we agree with the TTAB that such evidence shows a desire of competitors to avoid litigation rather than distinctiveness of the mark"). Accordingly, we find that Applicant's vague testimony and lack of corroborating evidence about enforcement efforts are not probative of the acquired distinctiveness of the applied-for mark.

Applicant's indefinite testimony of its enforcement efforts - together with the record evidence of third-party use - further undercuts Applicant's assertion of substantially exclusive use. In view thereof, we find that Applicant has failed to demonstrate the "substantially exclusive" use of the purported mark required by the statute. 15 U.S.C. § 1052(f); *In re Owens-Corning*, 227 USPQ at 424 n.11.

### 6. Unsolicited Media Coverage

Indeed, there is much evidence of record wherein Applicant's Ark bag has been favorably reviewed or otherwise featured in various magazines, third-party social media posts and product reviews. Many celebrities, such as Jessica Alba,[143] and social media bloggers with a number of followers, have been photographed posing with an

---

[143] Apr. 2, 2018 Response to Office Action at TSDR 61.

Ark bag.[144] Other celebrities have been photographed with the Ark bag, including Rosie Huntington Whiteley,[145] Emma Stone, and Beyoncé.[146]

Applicant's Ark bag has received much favorable press. For example, the Ark bag is one of many fashion accessories promoted in the February 27, 2017 issue of STAR magazine.[147] It is also promoted as a "Statement Bag" by Brit & Co.[148] and "The coolest bag this summer."[149] Articles featuring the Ark bag have appeared in InStyle, People Magazine, The New York Times, US Weekly, Fashion Bomb Magazine, Fashionista, and Glamour.[150]

The record also includes evidence of favorable reviews and feature stories in media where, for example, the Ark bag is referred to as "signature", "iconic", "viral", and "famous", for example:

- The Zoe Report describes Applicant's bag as "One of the most recognizable and **ubiquitous accessories** among the style set, the Cult Gaia Ark bag was the **It** carryall of summer. Its unique shape and bamboo design made it a must-have for warm weather, and everyone from starlets to bloggers were thoroughly obsessed (as evidenced on Instagram)."[151]
- Net-a-porter.com: "Los Angeles-based label Cult Gaia garnered social media **fame** thanks to its **coveted 'Ark' bag – a crescent-shaped bamboo clutch** that feels offbeat yet timeless."[152]

---

[144] Apr. 2, 2018 Response to Office Action, Larian Decl. ¶8 at TSDR 29, and Exhibits B (at TSDR 59) and C (at TSDR 138).

[145] Apr. 2, 2018 Response to Office Action at TSDR 72.

[146] Apr. 16, Response to Office Action at TSDR 77-79.

[147] Apr. 2, 2018 Response to Office Action at TSDR 62.

[148] *Id.* at 63.

[149] *Id.* at 65.

[150] Apr. 16, 2021 Req. Recon., Exhibit 1 to the Medenica Decl. at TSDR 76-133.

[151] Apr. 2, 2018 Response to Office Action at TSDR 102 (emphasis added).

[152] Jul. 1, 2019 Response to Office Action at TSDR 1167 (emphasis added).

- ModaOperandi.com: "The **crescent bamboo clutch – the Ark bag – was officially the style for the last year's summer parties** and trips abroad."[153]

Additional examples can be found in Applicant's previously-filed response[154] and its brief.[155] This favorable unsolicited media attention weighs in Applicant's favor; however, this evidence alone does not equate to a finding of acquired distinctiveness and is insufficient to overcome the evidence of record in connection with the other factors, which on balance weigh against Applicant.

### B. Conclusion Regarding Acquired Distinctiveness

Overall, this record does not support a finding that consumers perceive the design of Applicant's handbag as an indicator of source. Based on a consideration of the all the evidence in the record, we find that Applicant has failed to establish that its handbag design embodying the proposed mark has acquired distinctiveness within the meaning of Section 2(f) of the Trademark Act.

## II. Decision

The refusal to register Applicant's proposed mark is affirmed on both grounds.

---

[153] *Id.* at 1194 (emphasis added).

[154] Jul. 1, 2019 Response to Office Action at TSDR 98-99.

[155] Applicant's brief, p. 16, part (ii) (13 TTABVUE 21).